

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-21-00112-CV

In the Interest of **D.R.P.**, T.M.B., J.D.B., and M.A.R.B., Children

From the 57th Judicial District Court, Bexar County, Texas
Trial Court No. 2019-PA-01835
Honorable Charles E. Montemayor, Judge Presiding

Opinion by: Irene Rios, Justice

Sitting: Rebeca C. Martinez, Chief Justice
Irene Rios, Justice
Beth Watkins, Justice

Delivered and Filed: October 6, 2021

AFFIRMED

A.P. appeals from a judgment terminating her parental rights to her four children, D.R.P.,

T.M.B., J.D.B., and M.A.R.B. ("the children").[1] On appeal, A.P. argues the trial court erred in

denying her motion for mistrial and motion for new trial, both of which complained about her

inadvertent exclusion from part of the trial. She also challenges the sufficiency of the evidence to

support the trial court's finding that termination of her parental rights was in the children's best

interest. We affirm.

---

[1] To protect the identity of the minor children in an appeal from a judgment terminating parental rights, we refer to the children, the parents, and the foster parents by their initials. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

**BACKGROUND**

On September 9, 2019, the Department of Family and Protective Services ("the Department") filed a petition for termination of A.P. and T.B.'s parental rights and for emergency removal of the children, who were ages ten, seven, six, and four at the time. A.P. is the mother of all four of the children. T.B. is the father of the three younger children, T.M.B., J.D.B., and M.A.R.B.[2] After the trial court ordered the children's emergency removal, the oldest child, D.R.P., was placed with her father, V.A., and the three other children were placed in foster care. The Department prepared a service plan for A.P., which, among other things, required A.P. to participate in parenting classes and individual therapy.

The trial court held a four-day bench trial on October 2, 2020, October 21, 2020, November 16, 2020, and January 22, 2021. Because of the COVID-19 pandemic, the trial was conducted remotely. The first day of trial was conducted by way of telephone conference call. The remainder of the trial was conducted using Zoom video-conferencing technology. A.P. attended the first, third, and fourth days of trial. However, A.P. did not attend the second day of trial because she was inadvertently placed in a Zoom waiting room. On the third day of trial, A.P. moved for a mistrial based on her exclusion from the second day of trial. The trial court denied the motion for mistrial but implemented remedial measures. The trial court provided A.P. and her attorney the reporter's record from the second day of trial and gave them the opportunity to review it. The trial court also said that it would consider a request from A.P.'s attorney to recall the two Department witnesses who had testified during A.P.'s absence from the trial.

At trial, the Department presented testimony from multiple witnesses, including two of its investigators and one of its caseworkers; the oldest child's father; a foster parent who was caring

---

[2] The record shows that T.B. died after the case went to trial.

for three of the children; and a counselor for two of the children. The Department's evidence showed that Child Protective Services had been involved with A.P. and her children since 2014 because of drug use by T.B., A.P.'s inability to protect the children, unreported domestic violence between T.B. and A.P., and chronic homelessness and instability. A Department investigator testified that A.P. had been given many opportunities "to empower herself" with family services and housing, but she had failed to engage in those opportunities and to utilize the resources provided.

The Department filed this case and sought removal of the children immediately after another child, an infant, died while he was in A.P. and T.B.'s care. The Department was unable to determine if A.P. and T.B. were responsible for the infant's death. After their removal, the children reported that they had been physically abused by A.P. and T.B. Some of the children feared that they would be physically abused again if they were returned to A.P. and T.B.'s care. While the case was pending, A.P. had in person and remote visits with the children. However, these visits eventually ceased because the children did not want to visit with A.P.

A.P. testified on her own behalf, stating that she loved her children and wanted them returned to her. A.P. emphasized that she was presently employed and had participated in parenting classes for five years. A.P. admitted that she had hit the children "with [her] hand," but claimed that she now knew this was wrong and that she wanted to break the cycle of abuse.

After the trial, the trial court signed a judgment terminating A.P.'s parental rights. The judgment reflects that the trial court terminated A.P.'s parental rights on three grounds, subsections 161.001(b)(D), (N), and (O) of the Texas Family Code.[3] The trial court also found that termination

---

[3] The trial court found A.P.: (1) knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being under subsection (D); (2) constructively abandoned the children under subsection (N); and (3) failed to comply with the provisions of a court order that specifically established the

of A.P.'s parental rights was in the children's best interest. A.P. subsequently filed a motion for new trial, in which she reiterated her complaint about being excluded from part of the trial.[4] The trial court denied the motion for new trial. A.P. appealed.

**MOTION FOR MISTRIAL**

In her first issue, A.P. argues that her inadvertent exclusion from part of the trial was an "irregularity that prevent[ed] a proper judgment from being rendered." According to A.P., the trial court abused its discretion in denying her motion for mistrial and her motion for new trial.[5]

**Pertinent Facts**

Because of the COVID-19 pandemic, the trial was conducted remotely using telephone and video conferencing. A.P. attended the first day of trial, which was conducted via telephone conference call. The remainder of the trial was conducted using Zoom video-conferencing. At the beginning of the third day of trial, A.P.'s attorney moved for a mistrial. He informed the trial court that A.P. had been inadvertently placed in the Zoom waiting room during the entire second day of trial. A.P.'s attorney called A.P. to testify, and she explained that she had been "put in the waiting room in the beginning of the session after [she] said hello to everybody" and that while she was in the waiting room, she had received messages thanking her for her patience and stating that the court was working on another case. A.P. further testified that she eventually received a message that, unless she was a participant in another case, she needed to leave the Zoom waiting room and

---

actions necessary for her to obtain the return of the children under subsection (O). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (N), (O).

[4] A.P.'s motion for new trial presented another ground for granting a new trial, but she does not complain about this ground on appeal.

[5] In its briefing, the Department treats A.P.'s argument as a constitutional complaint, but A.P. did not raise a constitutional complaint in the trial court and she does not raise one on appeal. *See In re M.J.M.L.*, 31 S.W.3d 347, 352 (Tex. App.—San Antonio Sept. 27, 2000, pet. denied) (holding that constitutional issues must be properly raised in the trial court or they are waived on appeal).

call her attorney. A.P. called her attorney and explained to him that she had been placed in the Zoom waiting room. During this conversation, A.P. learned that the trial had proceeded without her. A.P. also testified that she had "messaged" her attorney while she was in the Zoom waiting room but she did not receive a response from him. A.P.'s attorney advised the trial court that he typically places his cellphone on silent during Zoom hearings.

After the trial was over and the trial court rendered judgment terminating A.P.'s parental rights, A.P. filed a motion for new trial in which she reiterated her complaint about being excluded from part of the trial proceedings. In her motion for new trial, A.P. argued, among other things, that a new trial should be granted because "on the second day of the multi-day trial of this case, after being present" she "was inadvertently placed in the Zoom waiting room for the duration of the testimony that day and thus did not participate in that day of trial." The trial court denied the motion for new trial.

**Standard of Review and Applicable Law**

We review rulings on motions for mistrial and motions for new trial under an abuse of discretion standard. *In re D.E.H.*, 301 S.W.3d 825, 830 (Tex. App.—Fort Worth 2009, pet. denied); *In re J.A.*, 109 S.W.3d 869, 874 (Tex. App.—Dallas 2003, pet. denied). Under an abuse of discretion standard, a reviewing court may reverse the trial court's decision only if the trial court acted without reference to any guiding rules and principles, or if its ruling was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). "A mistrial is an appropriate remedy only in 'extreme circumstances' for 'a narrow class of highly prejudicial and incurable errors.'" *F.C. v. Tex. Dep't of Family & Protective Servs.*, No. 03-19-00625-CV, 2020 WL 101998, at *8 (Tex. App.—Austin Jan. 9, 2020, no pet.) (mem. op.). "The remedy halts trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Id*. (quotations omitted).

**Analysis**

Here, A.P.'s inadvertent exclusion from part of the trial was not so highly prejudicial and incurable that it required the trial court to grant a mistrial. The record shows the trial court took action to remedy the error and nothing indicates this action did not cure the error. The trial court provided A.P. and her attorney with the transcribed testimony of the two witnesses who had testified during A.P.'s absence from the trial and gave A.P. and her attorney a chance to review and discuss this testimony before the conclusion of the trial. The trial court said it would entertain a request to recall the two witnesses or reconsider their testimony if A.P. and her attorney deemed it necessary. However, A.P. and her attorney did not ask the trial court to recall the witnesses or reconsider their testimony. Additionally, A.P. attended the majority of the trial and she was able to testify on her own behalf. Furthermore, A.P.'s attorney participated in the entire trial. Under these circumstances, the trial court did not abuse its discretion in denying A.P.'s motion for mistrial and motion for new trial based on her inadvertent exclusion from part of the trial. *See In re P.L.*, No. 07-18-00157-CV, 2018 WL 4039230, at *4 (Tex. App.—Amarillo Aug. 23, 2018, pet. denied) (mem. op.) (concluding the trial court did not abuse its discretion in denying incarcerated parent's motion for mistrial when the federal prison did not allow him to participate in the majority of the trial and his attorney and the trial court took steps to obtain his presence telephonically); *F.C.*, 2020 WL 101998, at *8 (concluding the trial court's denial of a motion for mistrial based on allegedly prejudicial testimony was not an abuse of discretion).

A.P.'s first issue is overruled.

**BEST INTEREST OF THE CHILDREN**

In her second issue, A.P. argues the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of the children.

**Standard of Review and Applicable Law**

To terminate parental rights under section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence: (1) one of the predicate grounds in subsection 161.001(b)(1); and (2) that termination is in the best interest of the children. *See* TEX. FAM. CODE ANN. §§ 161.001(b), 161.206(a). "Clear and convincing evidence" requires "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

When conducting a legal sufficiency review in a parental termination case, we look at all the evidence in the light most favorable to the finding to determine if a reasonable factfinder could have developed a firm belief or conviction that the finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). "[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). "A corollary to this requirement is that a [reviewing] court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* However, this does not mean that we disregard all evidence that does not support the finding. *Id.* Disregarding undisputed facts that do not support the finding could distort the analysis of whether clear and convincing evidence exists. *Id.*

When conducting a factual sufficiency review in a parental termination case, a reviewing court must give due deference to "evidence that the factfinder could reasonably have found to be clear and convincing." *Id.* The inquiry is whether, based on the evidence, "a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *Id.* Further, a reviewing court "should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id.* Taking into consideration the entire record, if the disputed evidence that a reasonable factfinder could not have

credited in favor of the finding is so compelling that a factfinder could not reasonably have developed a firm belief, then the evidence is factually insufficient. *Id.*

We cannot reassess witness credibility or substitute our judgment for that of the trial court. *In re J.P.B.*, 180 S.W.3d at 573. This is because "the trial judge is best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.) (quoting *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.)). Therefore, we are obligated to defer to the trial court's credibility determinations as long as they are reasonable. *In re J.P.B.*, 180 S.W.3d at 573.

Evidence that proves one or more statutory ground for termination may also prove that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). "A best interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

In evaluating the best interest of the children, we consider the non-exhaustive *Holley* factors.[6] *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child[ren]'s best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d at 27. In analyzing these factors, we focus on the children's best interest, not the parent's

---

[6] These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or the proposed placement; (8) the parent's acts or omissions indicating that the existing parent-child relationship is not a proper one; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

best interest. *Dupree v. Tex. Dept. of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

We recognize the existence of a strong presumption that the children's best interest is served by keeping them with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, we also presume that their prompt and permanent placement in a safe environment is in the children's best interest. TEX. FAM. CODE ANN. § 263.307(a). In determining whether a parent is willing and able to provide her children with a safe environment, we consider the factors listed in section 263.307(b) of the Texas Family Code. TEX. FAM. CODE ANN. § 263.307(b).

**Analysis**

With these standards and factors in mind, we examine the evidence as it relates to the children's best interest. At the time of trial, D.R.P., was eleven years old; T.M.B. was eight years old; J.D.B. was seven years old; and M.A.R.B. was five years old.

*Desires of the Children*

A Department caseworker, Ashley Hernandez, testified that the children's visits with A.P. stopped because the children refused to see A.P. According to Hernandez, D.R.P. wanted to remain with her father, V.A., and her stepmother.

D.R.P.'s father, V.A., testified that D.R.P. was not interested in seeing A.P. and wanted nothing to do with her. He explained that the decision to stop visits with A.P. was a decision that D.R.P. made on her own.

The younger children's foster mother testified that the children's visits with A.P. stopped because the children did not want to have visits with her.

*The Present and Future Emotional and Physical Danger to the Children*

Department investigator Brenda Santana testified that the Department's concerns about A.P. and T.B. went as far back as 2014. These concerns were based on consistent drug use by T.B.,

A.P.'s inability to protect the children, unreported domestic violence between T.B. and A.P., and the family's chronic homelessness and instability. Specifically, Santana testified that A.P. had refused to limit T.B.'s contact with the children even though she knew that he was abusing drugs and she needed to protect the children from him as part of a safety plan.

D.R.P.'s father, V.A., testified that D.R.P. was physically abused by A.P. and T.B. Additionally, D.R.P. was cognizant of T.B.'s drug use. D.R.P. had found a syringe while she was living with A.P. and T.B. V.A. did not believe that A.P. could be protective of any of the children if they were returned to her care. He further testified that D.R.P. worried about her siblings being returned to A.P. and T.B.'s care.

Hernandez, the Department caseworker, testified that D.R.P. said she was worried that if she and her siblings were returned to A.P., they would be hurt again and possibly pass away. Additionally, the three younger children expressed a fear of being physically abused again. When Hernandez attempted to discuss the children's concerns about physical abuse and returning to her care, A.P. said that "the children needed to get over it and move on from their past." Hernandez did not think that A.P. understood how the physical abuse, neglectful supervision, and trauma had affected the children and would continue to affect them in the future. Hernandez believed that A.P. was unable to meet the children's emotional needs.

Hernandez observed that A.P. had failed to change the behavior that led to the children's removal, and she had only made limited progress in therapy. Despite taking parenting classes for an extended period of time, A.P. still behaved inappropriately during some of her visits with the children.

*The Children's Present and Future Physical and Emotional Needs*

D.R.P.'s father, V.A., testified that when D.R.P. first came to live with him, she was very fearful, harbored a lot of anger, suffered from nightmares, and woke up crying in the middle of the

night. After visiting with A.P., she had tantrums. He also testified that D.R.P. discussed drugs excessively. However, since coming to live with V.A. and participating in counseling, D.R.P.'s behavior had improved significantly. D.R.P. was attending school regularly and was doing very well academically.

Also admitted into evidence were two letters D.R.P. wrote to A.P. while the case was pending. In one of the letters, D.R.P. stated that she feared A.P. would not keep her or her siblings safe and that A.P. would "hurt us again." The caseworker, Hernandez, testified that the letters were concerning because in them D.R.P. expressed her anger and fear of A.P. and stated that she and her siblings would not be safe if they were with A.P.

When the three younger children were first placed in foster care, they were extremely fearful, had nightmares, and hit and kicked each other. One child refused to sleep in a bed. Two of the children experienced bed-wetting. According to a counselor, T.M.B. felt that he was responsible for keeping his siblings in control and that he would hit them if they "did not mind what he wanted." T.M.B. also said he did not feel bad when he hit one of his siblings; he only felt bad when someone hit him.

J.D.B., who is hearing impaired, requires a cochlear implant device. When J.D.B. was initially placed with his foster family he refused to take a bath or brush his teeth and he removed and broke his cochlear device. However, by the time the case went to trial, J.D.B. was wearing his cochlear device every day, and he had learned some sign language to help him better communicate.

All the children were deeply affected by their baby brother's death and therefore participated in bereavement therapy. T.M.B. and M.A.R.B. continued to participate in behavioral therapy.

After some of their visits with A.P., the children became emotional and/or destructive. D.R.P. cried a lot and kicked and threw things, and V.A. had to help her calm down. The three

younger children sometimes went to their bedrooms and tore up their possessions. On one occasion, the children broke all of the ornaments on the Christmas tree in their bedroom.

All four children were extremely upset by A.P. bringing another child to a remote visit and telling them that the child was her "new daughter." D.R.P.'s father, V.A., testified that after A.P. yelled at D.R.P. and discussed dying animals with her during a visit, D.R.P. said she wanted nothing to do with A.P. Eventually, all of the children decided to stop visiting A.P. According to their foster mother, the three younger children's behavior and academic performance significantly improved after they stopped visiting A.P.

*Acts or Omissions of the Parent/Excuses/Parental Abilities*

Various acts or omissions demonstrated that A.P.'s relationship with her children was not a proper one. Even prior to the children's removal, A.P. failed to adhere to the Department's requirement that she not allow T.B. access to the children because of his ongoing substance abuse. Additionally, A.P. failed to provide the children with structure and stability. The children did not consistently attend school, often roamed around the homeless shelter unsupervised, and lacked proper hygiene.

A.P. physically abused the children. In her testimony, A.P. admitted that she had hit the children "with [her] hands" but claimed she had not hit them "with items." A.P. testified that she was making progress in her therapy sessions and her parenting classes. A.P. explained that she was now aware that her past actions were wrong, and she was trying to break the pattern of past abuse.

Hernandez, the caseworker, believed that A.P. did not understand how the physical abuse, neglectful supervision, and trauma impacted the children. Hernandez testified that the three younger children were fearful of A.P. and feared repeat physical abuse by her. Hernandez also testified: "Their lives are very short at this time, and that trauma is quite significant."

Furthermore, while the case was pending, A.P. acted inappropriately during her visits with the children. During one visit, A.P. discussed dying animals with the children. During another visit, a remote visit, A.P. brought another child into the frame of the video, introduced the child as her "new daughter," and said that the child would be living with A.P. A.P. subsequently denied that this incident occurred and accused the children of lying about it. The incident upset the children. Shortly thereafter, the children decided they no longer wanted to visit with A.P. Additionally, the foster mother testified that some of A.P.'s in-person visits merely consisted of the three younger children playing with A.P.'s cellphones.

*Programs Available to Those Seeking Custody*

Hernandez testified that A.P. was discharged from individual therapy with a counselor because she had missed three consecutive sessions. A.P. was subsequently assigned to another counselor, with whom she again missed sessions. Thus, A.P. did not complete individual therapy as required by her service plan. A.P. was also required to attend parenting classes under her service plan. Even though A.P. attended parenting classes, a Department caseworker testified that A.P. had made little progress as evidenced by her behavior with the children during visits.

*Stability of the Home and Proposed Placements*

The Department placed D.R.P. with her father, V.A. Two Department employees testified that they had no concerns regarding V.A.'s parenting abilities. V.A. testified that he wants D.R.P. to remain with him because of the progress she has made mentally and behaviorally, and because he fears that D.R.P. would regress if she saw A.P. again. He testified that D.R.P. was now a "happy child" and is "doing great in school."

T.M.B. and M.A.R.B.'s counselor testified that the two children had bonded with their foster family. She no longer saw the "dangerous aggression" the children had exhibited earlier in

the case. The Department caseworker also testified that the three younger children are doing very well with their foster family even though they are not in foster-to-adopt homes.

The evidence showed all of the children were in stable environments and were making significant emotional and behavioral progress in their current placements.

*Relevant 263.307 Factors*

Section 263.307(a) of the Texas Family Code provides that "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Courts may consider the factors listed in section 263.307(b) in determining whether the children's parents are willing and able to provide the children with a safe environment.[7] Some of the section 263.307(b) factors were relevant in this case.

The evidence showed a high degree of emotional harm was done to the children, and A.P. was one of the perpetrators of the harm. The children feared future physical abuse by A.P., and often left visits with her feeling emotional and upset. Eventually, the children decided to stop visiting with A.P.

Additionally, the evidence showed a history of drug use by T.B., a family member who participated in caring for the children. A.P. was well aware of T.B.'s drug use. She admitted at trial that T.B. had used both methamphetamines and heroin. In 2019, T.B. tested positive for

---

[7] These factors are: (1) the children's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of harm to the children; (4) whether the children have been the victim of repeated harm after the initial report and intervention by the department; (5) whether the children are fearful of living in or returning to the children's home; (6) the results of psychiatric, psychological, or developmental evaluations of the children, the children's parents, other family members, or others who have access to the children's home; (7) whether there is a history of abusive or assaultive conduct by the children's family or others who have access to the children's home; (8) whether there is a history of substance abuse by the children's family or others who have access to the children's home; (9) whether the perpetrators of the harm to the children are identified; (10) the willingness and ability of the children's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the children's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the children's family demonstrates adequate parenting skills; and (13) whether an adequate social support system consisting of extended family and friends is available to the children. TEX. FAM. CODE ANN. § 263.307(b).

methamphetamines while the family was in a homeless shelter. A family safety plan was implemented and T.B. was precluded from having contact with the children. A.P. initially agreed to the family safety plan, but then violated it by leaving the shelter with T.B and the children.

Furthermore, the evidence established that A.P. failed to participate in individual therapy as required. She was discharged from therapy by one counselor and missed multiple sessions with another counselor. Thus, A.P. demonstrated an unwillingness to participate in individual therapy and to cooperate with the Department. And, despite attending years of parenting classes, A.P. showed little improvement in her parenting skills, as demonstrated by her inappropriate behavior during her visits with the children.

Based on the evidence, the trial court could have reasonably concluded that A.P. failed to effect positive personal changes within a reasonable amount of time, and that A.P. was unwilling and unable to take the steps necessary to provide the children with a safe and stable environment.

In support of her position that the evidence is legally and factually insufficient to support the best interest finding, A.P. argues that her lack of protective capacity and her potential to endanger the children are no longer risk factors because of T.B.'s death. We disagree. Despite T.B.'s death, A.P.'s detrimental behavior could be replicated in the future, especially given the other circumstances in this case, such as A.P.'s failure to complete her individual therapy. "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *In re E.D.*, 419 S.W.3d at 620. Additionally, A.P.'s other acts and omissions, such as her physical abuse of the children and her failure to understand the children's fragile emotional state, provide ample support for the best interest finding.

A.P. also emphasizes that at the time of trial the three younger children were not in a foster-to-adopt placement. However, as the Texas Supreme Court has stated, "the lack of evidence about

definitive plans for permanent placement and adoption [of the children] cannot be the dispositive factor; otherwise, determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located." *In re C.H.*, 89 S.W.3d at 28. Instead, the inquiry is whether, based on the totality of the record, the trial court could reasonably develop a firm belief that termination of the parent's rights would be in the children's best interest, even when the Department "is unable to identify with precision the child[ren]'s future home environment." *Id.*

Having reviewed the record and considered all the evidence in the appropriate light for each standard of review, we conclude the evidence is legally and factually sufficient to support the trial court's finding that termination of A.P.'s parental rights was in the children's best interest. *See id.* § 161.001(b)(2); *In re J.P.B.*, 180 S.W.3d at 573; *In re J.F.C.*, 96 S.W.3d at 266.

A.P.'s second issue is overruled.

CONCLUSION

We affirm the trial court's judgment.

Irene Rios, Justice